You're reserving five? Reserving five, yes, Your Honor. Okay. Good morning and may it please the Court. Steve Obermeyer on behalf of the American Bankers Association of Washington Federal. This case involves Congress's decision to enact legislation, the FAST Act, permitting the government to renege on the terms of the stock subscription agreement with Washington Federal. I want to ask you to start out about the standing of the association. Sure, Your Honor. The government says that if the ABA argument was meritorious, each ABA member bank would be entitled to different compensation or damage amounts depending on the claim vindicated, the number of shares owned, and possibly other considerations such as bank withdrawal, and that that would require individualized proof thus from the members, thus precluding associational standing. I want your response to that. I guess we disagree with the characterization that the government makes. The only variable here is the number of shares of stock that each bank has. The government's in possession of that information, or at least should be, and so the difference in the dividend payment is the only damages. There's only one variable and it's in the government's possession, so there's no participation of the individual members required. What's your best case to rebut the precedent in United Food and Commercial Workers? Your Honor, is that Brown or Brock? I believe that's Brown. It's Brown, yes. So I guess the first one I would start with Brown, two points about Brown. One is Brown says that the third prong of Hunt is prudential, and we're only talking about the third prong. The first two prongs aren't disputed. Second point is Brown specifically says in a footnote that it is not deciding whether a simplified damages formula would be foreclosed in associational standing. We have, I think, about five district court cases post-Brown where there are damages awarded in associational standing cases. The government admittedly cites a lot of circuit court cases, but almost all of them are pre-Brown, and almost every single one says they're not foreclosing damages. Has the Supreme Court ever endorsed associational standing where a plaintiff association seeks damages qua association? I would say Brock, Your Honor. So Brock was where I was going to go to next as our best case. It has been and always has been Brock in terms of Supreme Court, not district court cases post-Brown. So we would say Brock, Your Honor. In that case, you're talking about union damages, wages, that would have been calculated in a different way depending on how the court ruled on the legal issue there. It's very similar here, actually, Your Honor. Thank you. Go to your merits. Happy to move to the merits, Your Honor. So the result of the FAST Act, as it was intended, is that the United States has been obtaining and will continue to obtain billions of dollars from the targeted banks that the statute targeted for entirely unrelated transportation expenses. And this is an immensely important case. There's a lot of money on the line here. Is there anything that prohibits Congress from taking money from, you know, if they have fees or the like from one regulatory scheme and transferring it to appropriations on another scheme? The transferring of fees to a different scheme is not per se the problem here. It's evidence of two issues. One is, and the more important one, I think, for kind of how we briefed it, is that to the extent we're talking about the implied duty of good faith and fair dealing, that shows a lack of good faith. That still means you have to have a contract. There's nothing that would prohibit Congress from using money collected in one regulatory scheme for furthering other public interest. Understood, Your Honor, and I agree with that. Why not withdraw? Well, a couple of reasons, Your Honor. First of all, it's premature because this case is ongoing. So for any of the banks not to withdraw at this point would be not to wait to see how this ends up. The other thing is that there's a reality about withdrawing, which is this is a major kind of regulatory and business decision. And so it would take time, right? This is like an ocean liner. You can't just turn it around. It's only been two years since it's happened. Kind of the fallout of this is still being felt. So the fact that, okay, the law changes, snap my fingers, become recharter as a different, as a state bank or whatever, is not really realistic. And so I think it's important to understand that there are, and you can see that actually in how Washington Federal and how we pled this, the amount of time that went into the decision to move from the thrift and then to choose to be a national bank versus a state bank. Your breach of contract theory, it's with the Federal Reserve Bank? Well, it's with the United States, Your Honor, but the contract is with... But the stock subscription is with the Federal Reserve Bank, right? Correct, Your Honor, per the direction of the statute. Right. So I'm just trying to understand, if the stock subscription is issued by the Federal Reserve Bank and the Federal Reserve Bank is a non-appropriated funds instrumentality, then maybe the right place to be suing the Federal Reserve Bank is not in the Court of Federal Claims because the Federal Reserve Bank doesn't receive any appropriated funds from Congress. So, Your Honor, I would disagree that it's not a federal instrumentality. It is a federal instrumentality. That hasn't actually been challenged by the government directly at any point in the case. This court has said it was. It's a case called Denkler. It's not cited in these briefs because it was addressed below. I think we cited about 10 cases below that it was a federal instrumentality. DOJ has said... I have the language here, but... I thought Denk... Denkler says that the Federal Reserve is not an AFI? It is a federal instrumentality, is my recollection, Your Honor. But these are the cases we cited below. Again, this issue hasn't been raised on appeal by the government. The other thing is DOJ has said in an internal memo, or an Office of Legal Policy memo, I think it was, that basically says the Federal Reserve banks are federal instrumentalities. And the other thing is the reality is, Your Honor, they're the operating arm of the board. They're the operating arm of the Federal Reserve system. And within a definition, they have authority to make contracts, to issue stocks. So we've been kind of steadfast. They're a federal instrumentality from day one. And it really hasn't been challenged. Other than the occasional footnote. I think there's a footnote in the government's opposition. And then they've cited a District of Maryland case from 1982 multiple times. But that's the most they've ever said about it, Your Honor. I would also like to say, I was saying it's a very important case. It's also a unique case. Appellants are aware of no other government regime that's quite like the stock subscription regime that's at issue here. And the government hasn't cited any kind of regimes that are quite like this. I just want to get a little bit more into the details of your theory of what the contract is here and who created the contractual terms. I know that there's a separate document issued by the Board of the Reserve Banks that you accept and sign. But are the terms there separately negotiated? Or are they just based on the statutory requirements from the original Federal Reserve Act? I guess maybe there's two questions there, Your Honor. I guess the first question is, what is the contract? The contract, as we've said, is a combination of the statute, the stock subscription agreement, the letter, and the advice of holdings. Let's focus on the statute then. Because I think you're aware, it's cited all over the place, that it's very unusual to consider legislation to be termed contracts rather than regulatory regimes. And so if we're looking at that and looking at the language in the statute, how do you get over the presumption that this wasn't intended to be a contractual arrangement, that it's just a regulatory regime? The express language of the statute. What's expressed? Where does it give anybody the authority to enter into contracts rather than just requiring banks, if they want to be a national bank, to participate in a regulatory regime? It invites banks to subscribe to Reserve Bank stock. So that's all you've got? Well, subscribe is a synonym for contract, Your Honor. I mean, that goes back to Blacks 1910, which is just before the statute was enacted. What's your best case for the notion that when Congress uses language of this type, without anything further, that they intended to create a contractual relationship versus a regulatory relationship? I guess it's GROV, but it's also a U.S. trust. What are the facts of those cases? Well, so I guess we'll start with GROV. GROV was a statute about milk subsidies. And I don't have the language, I guess, directly in front of me, but basically the secretary shone into a contract, or I think it was something along those lines. Right, that's a little bit different, right, though. That's Congress directing somebody to enter in contractual relationships. That's a lot more like our more recent cases in the spent nuclear fuel industry where Congress directed energy to enter into contractual relationships, and they separately negotiated different contracts. You don't have that here. Well, Your Honor, respectfully, I disagree, because the word subscribe is what makes it directly analogous to those cases. They might as well have said contract with the Federal Reserve Banks to buy stock regimes, or excuse me, to buy Federal Reserve Bank stock. And again, they're directing them to subscribe, meaning that the banks then purchase and own the stock. In any kind of corporate setting, and that's what this is, it's a corporate stock, it's a corporate organization that the government's established, that stock relationship is a contract. We cite cases going back, Henevig, DuPay, other cases. Let me ask you this, then, hypothetically. If the government wanted to establish the same kind of regime and require national banks to participate, if they wanted to be termed a national bank and get all the benefits and privileges of that, and they wanted to, you know, make it entirely fee-funded and they would issue stock and the like, how would they do that, and how would they write the statute differently to make it a regulatory regime and not a contract regime? They could just, well, rather than saying that the banks were invited to subscribe to stock, they could, so let me step back for a second, Your Honor. The regime was set up as a voluntary regime, right? Right. This is my question, just to be clear. I want the exact same voluntary regime with all of the same requirements. What language would Congress have used to make it a regulatory regime rather than a contractual regime? Well, they wouldn't have used the word subscribe, I guess is the first thing I would say. Well, where would they have used? Well, Your Honor, I guess they could say to the extent you wish to be a member of the Federal Reserve Bank, you are required to purchase stock. I'm thinking off the top of my head here, Your Honor, as best I can. It couldn't be a stock purchase. Pardon me? Under that hypothetical, I don't see how it could be a stock purchase. And I agree, Your Honor. I don't think it's a purchase. You're basically saying that there's no legal way for Congress to set up a regulatory regime to have banks in this capacity without making a contractual arrangement, that they would have had to have some other type of regulatory regime. Conceivably, I guess, Your Honor, they could say, okay, banks, you have to be in, you have to pay, you get nothing in response, you get nothing else. In this case, they're saying there's... In the fact that they actually understood that there were, you know, cause and effect, or balances and whatever, and offered to give you return on the investment is what turned it into a contractual relationship. They could have made you do it for nothing, but once they gave you a return, that made it a contract rather than a regulation. Well, invited to subscribe, invited to join from the beginning, to accept the terms of the statute. That's what the original statute said, even for national banks. Sure, but what if it was invited to join, but you get nothing in return? Would that be a contract? Well, it depends on the circumstances of joiner. I mean, if you're paying to get something back, which is what happens here, they own the stock. The government said they own the stock. The statute says they own the stock. I mean, that's kind of fundamental to why this is a contract. So I'm trying to think of a hypothetical where they're not getting anything, but they're in the system. So they're in the system, then... Understood, Your Honor, but the reality is the vast majority of banks are not members of the Federal Reserve System. They choose not to do it for all kinds of reasons. There are all kinds of regulatory regimes that Congress makes you apply to and join if you want to participate in that industry, and what you get is the privilege of operating under some kind of federal charter or federal permission, and what you get is the benefits of allowing to operate in that sphere. That's a classic regulatory scheme. What they've done here is added a return on the investment in the stock. Well, they've required a buy-in and a return for the security that's purchased. Sure, but they could have required a buy-in to be a registered bank under the national banking laws. A fee. A fee, sure. This is not a fee, Your Honor. Well, that's the question. Is the fact that they've used this language in, what, 1913, sufficient to show that they intended to contract rather than to establish a national banking system? Well, again, I go back to the word subscribe because, yeah, it's from 1913, but also blacks now say subscribe means contract. They've kept the regime this way. Do they say it means subscribe in the terms of the presumption that Congress doesn't intend to enact contractual regimes? I mean, this isn't a case where we're operating on a level playing field. You have the burden of showing that Congress intended specifically to contract. Understood, Your Honor, and I don't think knowing what the definition of subscribe is. I mean, if we can draw an inference that this is a regulatory regime rather than a contractual regime, you lose, don't you? I don't think you can draw that inference, Your Honor. I don't think you can draw that inference, not when you're purchasing securities, which, by the way, as we say this in our reply brief, the president of Kansas Just be aware you're almost out of time. Understood, Your Honor. Just real quickly, the president of the Kansas City Fed has even said these are like bonds. The government has said the bonds are clearly contracts. It's a security that these banks own, so it's very different from a regulatory regime where it's just a matter of participating to pay. That's why I'm saying it's a unique, distinct regime. Thank you. We ate up a lot of your time. I'm going to let you have two minutes. Okay, thank you. May it please the Court. Mr. Preskin, has any Federal Reserve Bank ever asserted sovereign immunity as a defense in any action? I am not aware of whether they've done so, but I can't say whether they have or they have not, Your Honor. I'm asking that question because of the sovereign entity question. Right. Mr. Obermeyer was correct. We did not contend below that they needed to go to district court in California because the Federal Reserve Bank in this instance was acting as a federal instrumentality in effectuating the requirements of the Federal Reserve Act at the behest of the Board. I think we should start where you left off with Mr. Obermeyer. Can I just get one thing out of the way? I know that you argued this differently in the trial court ruling solely on the reservation of powers clause, and you argued that a little bit in the brief, but that wouldn't necessarily be inconsistent with the contractual theory, would it? Well, I think it would for two reasons, Your Honor. One is that the National Railroad case says that that reservation of power is hardly the language of contract. No, no, I get that, but that's in—I mean, if there were clear indication elsewhere, for instance, in the spent nuclear fuel cases, which I'm pretty sure you're familiar with, if Congress, which they clearly directed contractual arrangements there, if there had been a reservation of powers clause that says we reserve the right to change this at any time, that wouldn't change it from a contractual to a regulatory regime if the rest of the Act sounded in contract. Correct, but the plaintiffs would still lose under that hypothetical because under Bowen, where there was no dispute that there was a contract and the statute itself said it's titled voluntary agreements, the actual right at issue did not vest because there was a reservation of rights in the contract. It was one of the provisions, and that is what the plaintiffs allege here, that the Federal Reserve Act makes up the terms and conditions of the alleged agreement. So that reservation of powers clause is part of this supposed agreement. And so even if there was a contract based on some other indication of the government's intent, that right to a 6% dividend would not be a vested right that's contractually guaranteed and for which they could seek damages, much like California could not seek to vindicate their right to terminate their participation in the Social Security Act. I think it's pretty telling that when you ask what the number one case is that they have to show that there was an intent to contract here, they cited GROV, which is the Milk Diversion Program, where the statute, the court said the statute very clearly said if you want to participate, you have to apply, and it directed the Secretary of HHS to enter into agreements with cow farmers who were going to participate. Are you aware of any cases where courts have found that language in legislation by Congress itself formed the terms of the contract, rather than this Milk case or the SNF cases or some other cases where Congress directed agencies to enter into contracts? I mean, the cases they cite, the plaintiffs cite, are GROV, Radium Mines, and New York Airways. Those Radium Mine and New York Airways cases sort of were an older theory that the statute could make a contractual offer that could be accepted through performance, although in both cases there were other indicia that there was clear intent to contract. I think what's clear is that there is no case where a single word, like subscribe, in a contract was found sufficient to show that the government intended to contract. I think it's a little disingenuous to suggest that the Federal Reserve Act was a sort of free invitation for banks to sign up if they want. It does say that the national banks are invited to signify their acceptance, but if they don't, within a certain time period, they lose the right to be a national bank. And so, yes, it is voluntary to a point, but it is certainly not the same as a corporation offering its stock to the public for purchase. I think that brings us to the next point I'd like to make, which is that Mr. Obermeier both said that this is a very unique situation, a very unique program, but then said, but we should treat it just like a private stock transaction. And for a number of reasons, that doesn't hold water. This is not like I go down and buy a share of Apple. They have to join once they're a national bank. They have to buy a certain set amount of stock at a certain set price. It never loses value, and if they so choose, they can go get a full return of the money that they've invested. So this is very much a unique situation that is not analogous to a private stock transaction. There's no intent shown in the Federal Reserve Act for Congress to make this akin to just another private stock transaction between a corporation and a shareholder. Just quickly to address the standing issue that Your Honor raised, I think, again, it's telling that the best case they cite to is Brock for the proposition that damages are recoverable. In that case, the court held that it was a statutory interpretation that was being challenged, and they said as a result of the change in the statutory interpretation, I think it was union members may be entitled to damages, but they have to go seek that from a state authority. So the association there was not seeking damages in that litigation. And if that's the best case they can cite, I think it pales compared to the number of circuit court cases that we cited, many of which actually predate the Brown decision, that show that not only are damages, even where there's a relatively simple arithmetic, still require the individual participation, but I think plaintiffs sort of skip over the fact that if the claims themselves require individual participation, that the third prong is not satisfied for associational standing. So supposing instead of reducing the amount of interest paid, the government had said we're going to levy on all shareholders, and we're taking an amount, you'll have to pay an amount equal to the value that you've already paid. What would that be? As long as it is authorized by the statute or the regulation, that would be an exercise of the Federal Reserve's power to do that. I mean, there are certain circumstances that plaintiffs rely on. If there's a national emergency, then they can rely on their shareholders, the members, to provide additional capital. So that would, again, just be an exercise of the regulatory or statutory power. And, again, by joining the Federal Reserve, the banks take on the risk that the Federal Reserve will use any of the powers that it has given by statute or that Congress will use the powers of its reserved amendment. So the stock doesn't necessarily maintain all its value. Well, the stock itself still does, because if they came, if your hypothetical happened, Washington Federal could turn around tomorrow and say we're going to effectuate a withdrawal, and they would still have to return $100 per share of the share that they made. And so if we're focused just on that capital that they've invested here, they can get a full return if they withdraw. So is it the government's view that the Federal Reserve banks here are a non-appropriated funds instrumentality or not? I know we decided not to challenge jurisdiction on that basis, on the basis of the fact that the banks are operating as federal instrumentalities and sort of agents of the Federal Reserve, but they are not funded by appropriations, I believe, from the federal government. So I don't know where that fits into the sort of NAFI case law, but we certainly did not challenge jurisdiction on that basis. I mean, primarily because under 12b-6 the claims here fall so short of establishing a contract or a taking, that that was the focus of our briefing below, Your Honor. As a lawyer, I used to take the position representing GOCOs, the people who made the bombs that produced the nuclear waste, that they were functional equivalents of the United States and hence entitled to sovereign immunity. We didn't go that far, although that does bring up, I think, a good point to end on, which is the authority piece that Judge Hughes, you touched on to some extent in that the intent of the contract needs to show there's some authority. It's important to remember Mr. Cabral here is the Director of District Accounting for the Reserve Bank of San Francisco. He's not a federal employee, and so their claim here is that a non-federal employee who has no particular authority in any statute or regulation can actually buy in the United States to pay $60,000. Well, I think that would be true if that's the only thing they were relying on, but it seems like what they're really relying on is the Federal Reserve Act itself, and there clearly would be no question that if Congress had in that statute established a contractual scheme, they could probably still delegate that authority and say these non-federal people are entitled to implement the contracts we established. That's possible, though you would expect Congress to do so in far clearer language. Sure, it would have been a lot clearer than the language we have. But the fact that it was ultimately signed off on by a non-federal employee doesn't negate their theory. It would if they were basing it solely on the agreement, I think. Well, I mean, their theory sort of shifted to some extent below, and here they sort of throw up a bunch of things and point to them and hope that it coagulates around a contract. So if Washington Federal had filed this lawsuit in ND Cal, would the government have resisted that? It's certainly possible that they would have. I think it depends on what allegations were made, if it was a contract or if they tried to allege takings. It's hard to analyze that particular claim. We did not challenge the jurisdiction on that basis here. Unless the Court has any further questions, we'd ask the Court to affirm the chart. Thank you. You've got two minutes. Thank you. I'll try to be brief, Your Honor. With respect to the contract and what is the contract, I do want to make clear that it's not all over the place. It's the statute, it's the application, the subscription. The Reserve Bank then sends a letter saying dividends are paid at 6%, and they give what's a stock certificate, an advice of holdings, saying how much stock is held and how much stock is paid for. The actual stock subscription says that they're subscribing to stock, what Washington Federal submitted, and it says they agree to pay this money. So the contract is evidenced by all of those things, not just the statute. Who's the offeror? The United States, Your Honor. I mean, the offeror is the United States, and it's saying it's not that, I guess it's not unlike the Federal Reserve Banks. Well, excuse me, Your Honor, but the Congress is directing the banks to subscribe to stock with their local Fed. So they're saying go enter a stock subscription agreement. You could look at that offer as either a stock offer that would result in a unilateral implied in fact contract, or it's an invitation for Washington Federal to submit its offer as the offeror. It could be either one. It doesn't matter because the result is the same, right? So the offeror is either the government or it's Washington Federal. And all of those, all of the documents. Washington Federal then, who's the one accepting? Then it would be the San Francisco Fed, the United States still, Your Honor, at the direction of Congress. Because they've subscribed or been told to subscribe. And we talked about RAV, and we weren't able to mention the other cases, and Mr. Bruskin did mention the other cases we've relied on are New York Airways and Radium. But again, that's only under the theory of the statute being the offer, which is what Your Honor asked directly about. I mean, I think, you know, any of the cases that basically say that the government can, you know, that the rules of private contract rules apply to the government would apply here because what's happening is you're purchasing a stock security. And that's all my time. Thank you, Your Honor. Thank you. The matter will stand submitted. Thank you.